CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

AUG 14 2018

JULIA C. DUDLEY, CLERK
BY: s/ MARTHA L. HUPP
      DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| BRIAN H. CLARK, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:17-cv-00045 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| ROB COLEMAN, et al., | ) | By: Hon. Jackson L. Kiser |
| | ) | Senior United States District Judge |
| Defendants. | ) | |

This matter is before the Court on Motions for Summary Judgment filed by Defendants Sheriff Dan Smith [ECF No. 37], Rob Coleman [ECF No. 39], and Geri Hazelwood [ECF No. 41]. All motions were fully briefed by the parties, and I heard oral argument on July 12, 2018. Having reviewed the pleadings, arguments of counsel, and the applicable law, the motions are ripe for disposition. For the reasons stated herein, I will grant Sheriff Smith's and Geri Hazelwood's Motions for Summary Judgment, and deny Rob Coleman's Motion for Summary Judgment.

I.  **STATEMENT OF FACTS AND PROCEDURAL BACKGROUND**

Pursuant to the appropriate standard of review, the facts are recounted in the light most favorable to Plaintiff Brian Clark ("Plaintiff"), the party opposing summary judgment. See Scott v. Harris, 550 U.S. 372, 380 (2007).

For reasons unimportant to this Opinion, Plaintiff has been banned from the Patrick County Circuit Court Clerk's Office by the Hon. Martin Clark, with some exceptions. On July 25, 2016, during the time when the so-called "ban" was in place, Plaintiff asked his friends, Wendy Inzerillo and Denise Freeman, to file some papers on his behalf while he waited outside the courthouse. Both went into the clerk's office and, according to their sworn affidavits, while

Freeman returned to the car to have Plaintiff sign a paper, Inzerillo overheard several Patrick County Sheriff's deputies speaking about Plaintiff. (Wendy Inzerillo Decl. ¶ 6, May 30, 2018 [ECF No. 48-2].) According to Inzerillo, one deputy said, "Brian [meaning Plaintiff] doesn't know what we have in store for him," while another commented that he couldn't "wait to see his face when we take him down." (Id. ¶¶ 9–10.) Inzerillo affirms in her declaration that Defendant Rob Coleman ("Coleman") was one of the officers involved in the conversation, but does not specify whether he was a speaker. (Id. ¶ 12.) According the Inzerillo, a clerk in the courthouse alerted the deputies that Inzerillo was "with him," meaning Clark, and the deputies ended their conversation.

After Inzerillo overheard the conversation among the deputies, Plaintiff and his sister, Beth Richardson, left the courthouse in her car. (Brian Clark Aff. ¶ 6, May 30, 2018 [ECF No. 48-1].) As they were leaving, Plaintiff saw several deputies "rush" to their patrol cars. (Id.) While riding in the car with Richardson a short time later, Coleman effectuated a traffic stop on her car. According to Coleman, he saw Plaintiff make a "gesture" that "concerned" him, so he pulled the car over. (Robert Coleman Decl. ¶ 7, May 14, 2018 [ECF No. 40-3].) Plaintiff categorically denies that he made any obscene, inappropriate, or concerning gesture to Coleman or anyone else. (Clark Decl. ¶¶ 12–13.)

According to Plaintiff, after stopping the vehicle, Coleman approached the passenger side of the car; no officer approached the driver. (Id. ¶¶ 14, 17.) Coleman asked for Plaintiff's identification, which Plaintiff provided, and Coleman asked Plaintiff why he "had 'gigged' him (or why [Clark] had given [Coleman] the finger)." (Id. ¶ 15.) Coleman returned to his car and, for twenty minutes, Clark and Richardson were detained. (Id. ¶ 19.)[1]

---

[1] Although I am more or less constrained to reject his version of events for the purposes of this Motion, Coleman asserts, in conclusory fashion, that the stop of Clark was "lawful," and that, in his experience,

While he was waiting to be released by Coleman, Clark avers that six additional police vehicles arrived on the scene: one state police vehicle, four sheriff's office vehicles, and a Black Dodge Charger driven by Defendant Sheriff Dan Smith. (Id. ¶ 18.) A short time later, a seventh vehicle (the fifth sheriff's office vehicle) arrived on the scene. A Deputy Sheriff emerged from the car with a "no trespass notice" that he served on Clark. Plaintiff was then told he was free to go. Coleman does not assert that he was aware of the existence of the "no trespass notice" prior to the stop, but did state that it is standard procedure to ask for identification and run any individual stopped by the sheriff's department for outstanding warrants or process. In so doing, Coleman learned of the outstanding process to be served on Plaintiff.[2]

Plaintiff filed suit in this Court on July 10, 2017, against Defendants Rob Coleman, Geri Hazelwood, Sheriff Dan Smith, and Officer Does. [ECF No. 1.] He filed an Amended Complaint on April 5, 2018, substituting Deputy Ronnie Williams Jr., Deputy Dustin Dillon, Investigator Tyler Wilson, and Deputy Shawn Keffer for Officer Does. [ECF No. 33.] Sheriff Smith filed a Motion for Summary Judgment on May 16, 2018 [ECF No. 37], and Rob Coleman and Geri Hazelwood followed suit the next day [ECF Nos. 39, 41]. The motions were fully briefed by the parties, and I heard oral argument on the motions on July 12, 2018. After having reviewed the evidence and arguments of the parties, as well as the relevant law, the matter is now ripe for disposition.

---

"people do not wave inappropriate or obscene gestures to a law enforcement officer unless something is wrong." (Coleman Decl. ¶ 7.) Tellingly, he does not allege that he ever asked Clark if he was safe or that he inquired anything of the driver, nor does he assert any other interaction throughout his entire career where an "obscene" gesture was displayed towards him in an effort to indicate duress or request police assistance.

[2] Plaintiff says the "no trespass notice" had been served on him some time prior to the July 25 encounter.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); George & Co. LLC v. Imagination Entm't Ltd., 575 F.3d 383, 392 (4th Cir. 2009). A genuine dispute of material fact exists "[w]here the record taken as a whole could…lead a rational trier of fact to find for the nonmoving party." Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (internal quotation marks and citing reference omitted); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine dispute cannot be created where there is only a scintilla of evidence favoring the nonmovant; rather, the Court must look to the quantum of proof applicable to the claim to determine whether a genuine dispute exists. Scott, 550 U.S. at 380; Anderson, 477 U.S. at 249−50, 254. Not every factual dispute will defeat a summary judgment motion; there must be a *genuine* dispute over a *material* fact. Anderson, 477 U.S. at 247–48. A fact is material where it might affect the outcome of the case in light of the controlling law. Id. at 248. On a motion for summary judgment, the facts are taken in the light most favorable to the non-moving party insofar as there is a genuine dispute about those facts. Scott, 550 U.S. at 380. At this stage, however, the Court's role is not to weigh the evidence, but simply to determine whether a genuine dispute exists making it appropriate for the case to proceed to trial. Anderson, 477 U.S. at 249.

## III. DISCUSSION

Defendants Sheriff Dan Smith, Rob Coleman, and Geri Hazelwood have moved for summary judgment. The motions will be addressed in the order in which they were filed.

A. Sheriff Dan Smith

As an initial matter, Smith asserts that the Eleventh Amendment bars any suit against him in his official capacity as Sheriff of Patrick County. Obviously, he is correct. See, e.g., Blankenship v. Warren Co., 918 F. Supp. 970, 974 n.4 (W.D. Va. 1996) ("The Virginia Constitution creates five state officers which are charged with performing quintessential functions of state government: Commonwealth's Attorney, Treasurer, Commissioner of Revenue, Sheriff, and Clerk of the Court . . . [T]hese officers are . . . state actors and . . . are entitled to immunity pursuant to the Eleventh Amendment."). Insofar as the claims asserted against Smith are made against him in his official capacity, they are barred.[3]

Turning to the claims against Smith in his individual capacity, the facts adduced so far fail to establish any wrongdoing, or any involvement at all, by Smith. I assume that Count II, which asserts a claim for "Brief, Malicious Deprivation of Liberty Under Color of State Law," makes its claim under 42 U.S.C. § 1983. "Section 1983 of Title 42 creates a cause of action against any person who, acting under color of state law, abridges a right arising under the Constitution of the laws of the United States." Cooper v. Sheehan, 735 F.3d 153, 158 (4th Cir. 2013). In order to maintain a prima facie case under § 1983, a plaintiff must present facts showing that he was (1) deprived of a right secured by the Constitution or laws of the United States, and that (2) the alleged deprivation was committed by a person acting under color of state law. American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49–50 (1999); Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003).

---

[3] The exceptions to Eleventh Amendment immunity—abrogation, waiver, and Ex Parte Young—are not asserted here. See Bd. of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356, 363 (2001) (discussing abrogation); Lapides v. Bd. of Regents of Univ. Sys. of Ga., 535 U.S. 613, 618 (2002) (discussing waiver); Frew ex rel. Frew v. Hawkins, 540 U.S. 431, 437 (2004) (discussing Ex Parte Young). Although Plaintiff does seek an injunction in regards to Count IV, for reasons stated herein, the court lacks jurisdiction over Count IV.

Assuming, as I must, the existence of a plan to "take down" Plaintiff, Plaintiff has failed to offer any evidence to show, or even suggest, that Smith was aware of the existence of the plan, let alone a participant in it.[4] The only evidence adduced is Plaintiff's testimony that Smith arrived, at some point, on the scene of his traffic stop. He does not allege that Smith spoke with anyone,[5] let alone offer evidence of such a conversation. Even if such a conversation did occur, the record is devoid of its content. Likewise, there is no allegation, let alone factual support to show, that Smith was involved in the stop or played any role in Plaintiff's detention. As such, Plaintiff is unable to offer any proof that Smith deprived him of any constitutional rights under color of state law, and thus has failed to adduce evidence to show that "the alleged deprivation was committed by" Smith. Id.

Smith is also entitled to summary judgment on Count III, which asserts a claim for First Amendment retaliation. A plaintiff seeking to recover for First Amendment retaliation must show that "(1) [he] engaged in protected First Amendment activity, (2) the defendants took some action that adversely affected [his] First Amendment rights, and (3) there was a causal relationship between [his] protected activity and the defendants' conduct." Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 499 (4th Cir. 2005).

Plaintiff's primary failing on this claim is as to prong two—adverse action. For purposes of a First Amendment retaliation claim under § 1983, "a plaintiff suffers adverse action if the

---

[4] It is unclear whether Plaintiff is attempting to make out a conspiracy claim. See 42 U.S.C. §§ 1983, 1985(3), & 1986 (2017); Hafner v. Brown, 983 F.2d 570, 577 (4th Cir. 1992) (setting forth the elements of a civil conspiracy claim under § 1983). He did not allege a conspiracy claim in his Complaint. Even if his Complaint were read to assert a conspiracy claim, he has failed to show a "meeting of the minds" involving Smith. See Hafner, 983 F.2d at 577 ("The critical element is whether there was a meeting of the minds to accomplish the unlawful act.").

[5] Inzerillo does not allege that Smith was party to the alleged conversation in the clerk's office. (See Inzerillo Decl. ¶ 12.)

defendant's allegedly retaliatory conduct would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." Id. at 500. Here, Plaintiff has only offered evidence that Smith, at some point, arrived at the scene of his allegedly unconstitutional seizure. Without more, and under the objective standard applicable to this claim, see id., I cannot conclude that mere presence at the stop was sufficient to "chill a reasonable person's exercise of First Amendment rights . . . ." Id. at 500–01. Accordingly, Smith is entitled to summary judgment on Count III.

Finally, Count IV asks this Court to bar Smith from enforcing the terms of an order entered by Judge Martin Clark, Circuit Court Judge for Patrick County ("the Order"). Plaintiff previously challenged the Order before the Supreme Court of Virginia, but his Petition for Writ of Prohibition [ECF No. 1-5] was denied. The Rooker-Feldman doctrine bars my consideration of Count IV.

Under the Rooker-Feldman doctrine, a "party losing in state court is barred from seeking what in substance would be appellate review of the state judgment in a United States district court." Johnson v. De Grandy, 512 U.S. 997, 1006–06 (1994). "This is so because Congress has vested the power to entertain an appeal of a state court judgment only with the Supreme Court." Smalley v. Shapiro & Burson, LLP, 526 F. App'x 231, 235 (4th Cir. 2013) (unpublished). "A litigant may not circumvent these jurisdictional mandates by instituting a federal action which, although not styled as an appeal, 'amounts to nothing more than an attempt to seek review of [the state court's] decision by a lower federal court.'" Am. Reliable Ins. Co. v. Stilwell, 336 F,3d 311, 316 (4th Cir. 2003) (quoting Plyler v. Moore, 129 F.3d 728, 733 (4th Cir. 1997)). "The controlling question in the Rooker-Feldman analysis is whether a party seeks the federal district court to review a state court decision and pass upon the merits of that state court decision . . . .

Put another way, if 'in order to grant the federal plaintiff the relief sought, the federal court must determine that the [state] court judgment was erroneously entered or must take action that would render the judgment ineffectual,' Rooker-Feldman is implicated." Jordahl v. Democratic Party of Va., 122 F.3d 192, 199 (4th Cir. 1997) (quoting Ernst v. Child & Youth Servs., 108 F.3d 486, 491 (3rd Cir. 1997)).

Here, Count IV asks me to conclude that the Order should be struck down when the Supreme Court of Virginia has permitted the Order to stand.[6] (See Compl. ¶ 71.) Any such ruling from this court directing that the Order be ignored or lifted would unquestionably "render the [Supreme Court's] judgment ineffectual." Accord Brown & Root, Inc. v. Breckenridge, 211 F.3d 194, 196–97 (4th Cir. 2000) (finding application of Rooker-Feldman to be appropriate when the West Virginia Supreme Court declined to enter a writ of prohibition). Because the Rooker-Feldman doctrine is jurisdictional, however, I have no authority to enter judgment on Count IV. Rather, it must be dismissed without prejudice for lack of subject matter jurisdiction. See, e.g., Smalley, 526 F. App'x at 238.

For the foregoing reasons, Smith is entitled to summary judgment on Counts II and III, and Count IV will be dismissed without prejudice.

---

[6] In his Petition for Writ of Prohibition, Plaintiff only cited state statutory and constitutional rights; here, he asserts the ban violates his federal constitutional rights. Rooker-Feldman is not concerned with differing *theories* of recovery, however, but with whether, "in substance," the federal court's ruling would "render the judgment ineffectual." Moreover, Rooker-Feldman also bars consideration of claims which are "inextricably intertwined" with state court decisions. See District of Columbia v. Feldman, 460 U.S. 462, 486–87 (1983). Even though the precise arguments raised here were not before the Supreme Court of Virginia, the claims are inextricable intertwined, and therefore barred.

B. Lt. Rob Coleman[7]

Plaintiff has asserted claims for a violation of his rights under § 1983 (Count II) and for retaliation for his First Amendment activity (Count III) against Lt. Coleman.

Regarding Count II, as stated above, in order to maintain a prima facie case under § 1983, a plaintiff must present facts showing that he was (1) deprived of a right secured by the Constitution or laws of the United States, and that (2) the alleged deprivation was committed by a person acting under color of state law. Sullivan, 526 U.S. at 49–50.

Taking the facts in the light most favorable to Plaintiff, the evidence establishes that Coleman, acting in his capacity as a deputy sheriff, seized Plaintiff without probable cause or reasonable suspicion of wrongdoing. After Inzerillo overheard some deputies discussing a plan to "take down" Plaintiff, Coleman followed Plaintiff from the courthouse and effectuated a traffic stop on the vehicle in which Plaintiff was riding. The vehicle was stopped without probable cause or reasonable suspicion, and Coleman's expressed reason for stopping the vehicle is belied by Plaintiff's testimony, which I accept as true. Clearly, Plaintiff has presented sufficient evidence to show that Coleman, acting under color of law, violated Plaintiff's right to be free from unreasonable seizures. See Rodriguez v. United States, 135 S. Ct. 1609, 1617 (2015) (noting that a traffic stop constitutes a seizure for the purposes of the Fourth Amendment); Whren v. United States, 517 U.S. 806, 809–10 (1996) ("Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]. An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances. As a general matter, the decision to stop an automobile

---

[7] Although Coleman has since been promoted to the rank of Captain, at the time of the alleged encounter, he was a Lieutenant.

is reasonable where the police have probable cause to believe that a traffic violation has occurred.").

Coleman asserts that, even if Plaintiff has shown a violation of § 1983, he is protected by the doctrine of qualified immunity. Qualified immunity shields officials from civil liability so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)). Initially, the Supreme Court required lower courts, when confronting a claim of qualified immunity, to proceed in sequential fashion by first determining "whether the plaintiff had shown a violation of a constitutional right, *and* only if so, determine whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." Brown v. Elliott, et al., 876 F.3d 637, 641 (4th Cir. 2017) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). The Court mercifully changed course in 2009, holding that a District Court may "skip ahead to the question whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case." Pearson, 555 U.S. at 232, 236 (quoting Saucier, 533 U.S. at 201) (internal quotation marks omitted).

To resolve the question whether the right was clearly established at the time of the defendant's conduct, the court must ascertain the "circumstances of the case." Id. at 232 (quoting Saucier, 533 U.S. at 201). "At summary judgment, in the qualified immunity context as in others, courts must view the evidence in the light most favorable to the party opposing summary judgment." Brown, 876 F.3d at 641 (citing Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014)). In so viewing the evidence, a court must "credit[] the plaintiff's evidence and draw[] all reasonable inferences in the plaintiff's favor." Id. at 641–42.

"A court must then ask whether the official's conduct under these 'circumstances' violated 'clearly established law.'" Id. at 642 (citing Plumhoff v. Rickard, 134 S. Ct. 2102, 2023 (2014)). "Clearly established law" is not defined "at a high level of generality," because the "dispositive question is 'whether the violative nature of *particular* conduct is clearly established." Luna, 136 S. Ct. at 308 (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011)). A constitutional right is "clearly established" when "its contours [are] sufficiently clear that a reasonable officer would understand that what he is doing violates that right." Hope v. Pelzer, 536 U.S. 730, 739 (2002). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Saucier v. Katz, 533 U.S. at 202 (citing Wilson v. Layne, 526 U.S. 603, 615 (1999)). If the right is not "clearly established," the officer is entitled to immunity. See Sharp v. Johnson, 669 F.3d 144, 159 (3d Cir. 2012).

Applying the Saucier factors to the present case, Plaintiff's evidence establishes, at this stage, that he was subjected to an unconstitutional seizure by Coleman. As stated above, Plaintiff's evidence, taken as true, shows that Coleman effected a traffic stop—a seizure under the Fourth Amendment—without probable cause or reasonable suspicion. He did so after being party to a conversation about "tak[ing] down" Plaintiff. The evidence thus establishes that Plaintiff has "shown a violation of a constitutional right . . . ." Brown, 876 F.3d at 641 (citing Saucier, 533 U.S. at 201).

Turning to the question of whether the right was clearly established: it is axiomatic that an individual has the right to be free from unreasonable seizures in the absence of probable cause. But, "if the test of 'clearly established law' were to be applied at this level of generality, . . . plaintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually

unqualified liability." Gooden v. Howard Cnty., 954 F.2d 960, 968 (4th Cir. 1992) (quoting Anderson v. Creighton, 483 U.S. 635, 639 (1987)). The appropriate question, therefore, is whether a sheriff's deputy may perform a traffic stop on a person without cause, whether or not the individual displayed an offensive gesture to the officer.

If Plaintiff did *not* "gig"[8] Coleman, then there is no question that the right to be free from a traffic stop without probable cause was clearly established at the time Coleman stopped Plaintiff and his sister. There is no dispute that the authority to detain citizens, conferred on deputy sheriffs, does not include the power to harass and intimidate those with whom one disagrees. See Trulock v. Freeh, 275 F.3d 391, 405 n.10 (4th Cir. 2001) (noting that "police officers . . . may not exercise their authority for personal motives, particularly in response to real or perceived slights to their dignity"). Under that factual scenario, Coleman is not entitled to qualified immunity. But even if Plaintiff did "gig" Coleman, I believe the law clearly establishes that a traffic stop under those circumstances would not comport with the First or Fourth Amendments.

"[I]n the face of . . . challenges to police action, officers and municipalities must respond with restraint. . . . But the First Amendment recognizes . . . that a certain amount of expressive disorder not only is inevitable in a society committed to individual freedom, but must itself be protected if that freedom would survive." City of Houston, Tx. v. Hill, 482 U.S. 451, 471–72 (1987). "Clearly, under Hill, every person has a [F]irst [A]mendment right to question or challenge the authority of a police officer, provided that fighting words or other opprobrious language is not used." State ex rel. Wilmoth v. Gustke, 373 S.E.2d 484, 487 (W. Va. 1988). Although it does not appear the Fourth Circuit has addressed whether profane words or gestures

---

[8] To "gig" someone, as I assume this term is used, is to display one's middle finger so as to indicate an offensive message.

directed at police officer should be considered constitutionally protected speech, many other courts have. See, e.g., Johnson v. Campbell, 332 F.3d 199, 213 (3rd Cir. 2003) (holding that arresting a man for disorderly conduct after calling a police officer a "son of a bitch" violated the defendant's First Amendment rights); Buffkins v. City of Omaha, 922 F.2d 465, 472 (8th Cir. 1990) (holding that calling an officer an "asshole" was protected speech and thus could not form the basis for a disorderly conduct arrest); Duran v. City of Douglas, 904 F.2d 1372 (9th Cir. 1990); Osborne v. Lohr-Robinette, No. 1:05-0106, 2006 WL 3761597, at *2, 8 (S.D.W. Va. Dec. 20, 2006) (holding that calling a police officer an "asshole" and an "Opie-Taylor-looking motherfucker" was protected speech, but finding qualified immunity because the law was not clearly established in 2003). But see McCormick v. City of Lawrence, 325 F. Supp. 2d 1191 (D. Kan. 2004), aff'd 130 F. App'x 987 (10th Cir. 2005) (holding that yelling "Motherfuckers," "Fuck heads," "Fucking pigs," "Why don't you run around the track, chubby?," "Hey chubby, what's your name?," "Hey fatty," "Hey fat ass," and "Leave her the fuck alone," at police officers constituted fighting words rather than constitutionally protected speech).

The case of Duran v. City of Douglas, 904 F.2d 1372 (9th Cir. 1990), represents an excellent analog to the facts presented here. In that case, Ralph Duran, the passenger of an automobile, displayed an obscene gesture to Gilbert Aguilar, a police officer. Aguilar followed the car, which was driven by Duran's wife, and Duran "began yelling profanities in Spanish and continued to make obscene gestures." Id. at 1374. Aguilar, then recognizing Duran from a prior encounter at a bar that evening where the bartender had complained about an unruly patron, called for backup and effectuated a traffic stop on Duran's vehicle. Aguilar ultimately arrested Duran for disorderly conduct based on his conduct after the stop. See id. at 1374–75.

Duran brought suit against Aguilar, the city, and other officials. The district court denied Aguilar's claim of qualified immunity, and the Ninth Circuit Court of Appeals affirmed. In its holding, the Court of Appeals noted that the record lacked "any legitimate, articulate reason for Aguilar to have detained Duran." Id. at 1377. The Court concluded that, "[i]narticulate and crude as Duran's conduct may have been, it represented an expression of disapproval toward a police officer with whom he had just had a run-on. As such, it fell squarely within the protective umbrella of the First Amendment and any action to punish or deter such speech—such as stopping or hassling the speaker—*is categorically prohibited by the Constitution*." Id. at 1378 (emphasis added).

The Ninth Circuit also stated, rather appropriately:

> The freedom of individuals to oppose or challenge police action verbally without thereby risking arrest is one important characteristic by which we distinguish ourselves from a police state. Thus, while police, no less than anyone else, may resent having obscene words or gestures directed at them, they may not exercise the awesome power at their disposal to punish individuals for conduct that is not merely lawful, but protected by the First Amendment.

Id.

Even assuming that Plaintiff *had* "gigged" Coleman, Coleman's claim of qualified immunity would still fail. It is rare to have the exact factual scenario an officer faced to have been clearly ruled on before, but <u>Duran</u> has remarkably similar facts and a defendant who went further than simply "gigging" a police officer. Although not a case from this circuit, Duran was decided nearly twenty years ago and accurately states the law. In light of the relevant precedent, even if Plaintiff had gigged Coleman, Coleman still lacked any authority to seize him during a traffic stop, and a reasonable officer should have known that any seizure was in contravention of

the Constitution. Coleman's claim of qualified immunity is rejected, and Count II will proceed to trial against Coleman.

Coleman is entitled to summary judgment, however, on Count III, as Plaintiff has failed to offer any evidence that Coleman was aware of Plaintiff's statements "that were critical of Patrick County public officials." (Compl. ¶ 14.) A plaintiff seeking to recover for First Amendment retaliation must show that "(1) [he] engaged in protected First Amendment activity, (2) the defendants took some action that adversely affected [his] First Amendment rights, and (3) there was a causal relationship between [his] protected activity and the defendants' conduct." Constantine, 411 F.3d at 499. "In order to establish this causal connection, a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of [his] engaging in protected activity." Id. at 501 (citing Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998)). Because there is no evidence that Coleman was aware of Plaintiff's protected speech,[9] summary judgment is appropriate as to Count III.

### C. Geri Hazelwood

Plaintiff asserts a single count against Geri Hazelwood for a First Amendment retaliation claim under § 1983. To reiterate, a plaintiff seeking to recover for First Amendment retaliation must show that "(1) [he] engaged in protected First Amendment activity, (2) the defendants took some action that adversely affected [his] First Amendment rights, and (3) there was a causal relationship between [his] protected activity and the defendants' conduct." Constantine, 411 F.3d at 499.

As to Hazelwood, Plaintiff has failed to offer any evidence that (1) Hazelwood knew of Plaintiff's protected activity, or (2) that Hazelwood's actions were causally related to Plaintiff's

---

[9] Plaintiff denies that he "gigged" Coleman. Therefore, any claim of retaliation based on that expressive conduct cannot stand as Plaintiff has testified that no expressive action occurred. In the absence of speech, a First Amendment retaliation claim on the basis of speech cannot stand.

protected activity. The evidence shows that, at most, Hazelwood signed the "no trespass" notice at the direction of her supervisor. Plaintiff has not shown that Hazelwood was aware of his past statements, nor has he offered any evidence to show that Hazelwood's actions were motivated, in whole or in part, as retaliation for Plaintiff's protected activity. "In order to establish this causal connection, a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of [his] engaging in protected activity." Id. at 501 (citing Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998)). Plaintiff has failed to do so. In the absence of the minimal evidence required to sustain the claim, Hazelwood is entitled to summary judgment on Count I.

### IV. CONCLUSION

Under the Rooker-Feldman doctrine, this court lacks subject-matter jurisdiction over Count IV. Accordingly, that count will be dismissed without prejudice.

All remaining claims against Sheriff Dan Smith and Geri Hazelwood are legally or factually deficient, and they are entitled to summary judgment on all counts.

Coleman is entitled to summary judgment on Count III, but there is sufficient evidence for the case to proceed to trial on Count II against Coleman. His claim of qualified immunity does not withstand scrutiny and will be denied.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to all counsel of record.

**ENTERED** this 14th day of August, 2018.

s/Jackson L. Kiser
SENIOR UNITED STATES DISTRICT JUDGE