CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

MAR 24 2020
JULIA C. DUDLEY, CLERK
BY: s/ H. MCDONALD
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### DANVILLE DIVISION

| | | |
|---|---|---|
| **BRIAN H. CLARK,** | ) | |
| | ) | **Civil Action No. 4:17-cv-00045** |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ROB COLEMAN,** | ) | **By:    Hon. Michael F. Urbanski** |
| | ) | **Chief United States District Judge** |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

"Fits of rudeness or lack of gratitude may violate the Golden Rule. But that doesn't make them illegal or for that matter punishable or for that matter grounds for a seizure." Cruise-Gulyas v. Minard, 918 F.3d 494, 495 (6th Cir. 2019).

This case concerns whether an officer may stop a vehicle because a passenger displayed an offensive gesture towards the officer, a gesture that anyone must concede "was crude, [but] not criminal." Wilson v. Martin, 549 F. App'x 309, 311 (6th Cir. 2013). A jury was empaneled, and they determined that the officer's actions did not violate the passenger's rights. The question before the court is whether that verdict can stand. After a review of the applicable law and relevant evidence, the court **GRANTS** Plaintiff Brian Clark's motion to set aside the jury verdict and enter judgment for the plaintiff. ECF No. 141. The law plainly prohibits that which occurred here, and the jury's verdict cannot stand. However, the court **DENIES** Clark's motion for a new trial on the issue of damages, finding, as a matter of law, that Clark has not carried his burden of demonstrating compensable or punitive damages sufficient to warrant a new trial. Id.

**I.**

On the morning of July 25, 2016, Clark appeared in court in Patrick County, Virginia, on a civil matter unrelated to the present action. Previously, he had been banned from the courthouse, except under certain circumstances, by Circuit Court Judge Martin Clark. Because of that prior order, sheriff's deputies in Patrick County, who were responsible for courtroom security, were keenly aware of Clark. Defendant Lieutenant Rob Coleman was one of those deputies who was in the courtroom for Clark's hearing.[1] Coleman was stationed in the back of the courtroom and, according to his testimony, he was in the courtroom "for quite a while." Trial Tr. 205:11, July 15, 2019, ECF No. 146 (hereinafter "Tr."). Nothing "untoward" happened during Clark's hearing, and Clark did not act intoxicated. Id. at 203:25–204:1; 232:11-16.

After the hearing was over,[2] Coleman left the courthouse and drove his cruiser to a grocery store parking lot near the courthouse. Because he had been in court for some time, he pulled over to check messages and emails on his work cell phone. While Coleman sat in his cruiser, Clark and his sister, Beth Richardson, drove by. (Clark was the passenger, and his sister was driving.) As they did so, Clark "flipped [Coleman] off." Tr. 206:18.[3]

---

[1] Coleman has since been promoted to captain. At the time of the events in question, however, he was a lieutenant.

[2] Both Denise Freeman and Wendy Inzerillo testified to conversations they allegedly overheard that day among Patrick County Sheriff's Deputies regarding a plan to "take down" Clark. Their testimony is omitted here and is not considered by the court for two reasons. First, under the applicable standard of review, the evidence is taken in the light most favorable to Coleman. Because the jury returned a verdict in favor of Coleman, the court works under the assumption that the jury rejected Freeman's and Inzerillo's testimony. Second, even if the testimony were considered, there is no evidence that Coleman participated in any of the alleged conversations, nor is there evidence to suggest that, if such a plan did exist, Coleman was aware of it.

[3] The court assumes, and the parties do not appear to contest, that "flipping" someone off means to display one's middle finger so as to transmit a vulgar message of disapproval.

Coleman followed the car; he radioed the dispatcher his location, the license plate of the car, and the number of occupants, and effectuated a traffic stop on the vehicle. Coleman testified as to his rationale for the traffic stop:

> It took me by surprise. In 20 years of doing this job in uniform, I've never had anybody that would flip me off that was not under the influence of drugs or alcohol or not suffering from some sort of mental illness.

Id. at 206:21-25. Coleman believed "[t]hat he had something going on for him to flip a uniformed police officer off, that I needed to make contact with him." Id. at 207:14-16. Coleman testified that he did not charge Clark with a crime:

> No, I did not. After speaking to him, he didn't act intoxicated. He didn't act like he had any type of mental illness. I was just stopping him because it's very out of the norm for a normal citizen to flip off a police officer. . . . I thought it was quite possible that he either needed assistance for or that he had mistook me for somebody else or he was needing help.

Id. at 215:4-14. Coleman quickly made the assessment that none of this applied to Clark.

> After speaking with him and questioning him about him flipping me off, and his answer, I wasn't angry. He wasn't angry. We didn't get in to a heated discussion on the side of the road. I didn't pull him out of the car. I didn't ask him to step on [sic] the car. He stayed seated. I checked to make sure that he didn't have any other outstanding papers. Once that civil paper was brought to the scene and given a copy to him, he was free to go.

Id. at 215:16-23.

When asked on cross-examination whether a police officer may conduct a traffic stop when a passenger in a vehicle insults an officer, Coleman responded that testified that "[i]t depends." Id. at 231:4-8. Coleman explained the grounds under which such a stop may occur:

> If that person is doing something that would endanger himself or others, if he is or she is acting in a mentally ill way or where they could be a danger to someone else or themselves or someone else, then yes, it would be – it wouldn't be probable cause, but it would be enough for me to have reasonable suspicion that something is not normal with the passenger in that vehicle and I need to investigate further.

Id. at 231:9-18.

Once he pulled the car over, Coleman approached the passenger's side of the car. At no point did Coleman approach, or even speak to, the driver. See Tr. 120:10–11. Coleman asked Clark for his identification, which Clark readily produced. Coleman testified that he asked Clark: "What made you flip me off? Are you okay?" Id. at 210:12–13. Clark said he was waving and disagreed that he flipped Coleman off. Although Coleman testified that he realized at that point that Clark was neither intoxicated nor deranged, he did not send Clark on his way. Rather, Coleman walked back to his police car and called dispatch to run a check on Clark.

During the stop, several other patrol cars arrived to support Coleman as needed. See, e.g., Tr. 146:1–13 (testimony of Dustin Dillon); 152:14–24 (testimony of Shawn Keffer); 161:7–162:5 (testimony of Ronald Williams). At some point, Coleman noticed Denise Freeman, a friend of Clark's, videoing the scene with a cellular phone or iPad from some distance away. For his own safety, Coleman approached Freeman and explained that, while she was free to video him, for officer safety she needed to be in front of him. Ultimately, Coleman issued her a citation for impeding traffic.

Upon calling in Clark's information to dispatch, Coleman was alerted that there were civil papers to be served on Clark. Although the papers in question had been served on Clark

some months prior, Coleman was not aware of that fact, and nothing apparently indicated to him or to the dispatcher that those papers had previously been served. Deputy Shawn Keffer, who had arrived on the scene after Coleman's call out, returned to dispatch, retrieved the papers, returned to the scene, and served the papers on Clark. Although Coleman had taken Clark's driver's license, another deputy returned it to him, and Clark was permitted to leave after approximately 10 – 20 minutes. Neither Clark nor his sister were cited for any crime or traffic infraction. Indeed, Coleman testified that "there was nothing about the way the driver was driving the car that indicated any kind of violation of any traffic laws at all." Id. at 119:14-17.

Clark filed suit against Coleman (and others) on July 10, 2017, alleging violations of his constitutional rights, and this matter was tried by a jury on July 15–16, 2019. At trial, the jury was instructed as follows:

> To succeed on this claim [that Coleman violated Clark's Fourth Amendment rights], the plaintiff must prove each of the following elements by a preponderance of the evidence:
> First: That the defendant intentionally committed acts that violated the plaintiff's federal constitutional right not to be seized without reasonable suspicion;
> Second: That the defendant acted under color of law; and
> Third: That the defendant's conduct caused the plaintiff's injuries.
> As regards the first element, the plaintiff claims that the defendant seized him under unreasonable circumstances. In general, a seizure of a person in a traffic stop without a warrant is reasonable if the officer had reasonable suspicion to believe the plaintiff had committed or was committing a crime. In order to prove the seizure in this case was unreasonable, the plaintiff must prove by a preponderance of the evidence that he was arrested without reasonable suspicion. The plaintiff has the burden of proving that the defendant lacked reasonable suspicion for the stop. . . .

Government officials in general, and police officers in particular, may not exercise their authority for personal motives, particularly in response to real or perceived slights to their dignity. The Constitution requires that, in the face of verbal challenges to police action, officers and municipalities must respond with restraint. The Constitution protects a significant amount of verbal criticism and challenge directed at police officers. Speech, including expressive gestures, is often provocative and challenging. But it is nevertheless protected against censorship and punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest. If you find that the traffic stop was solely in response to constitutionally protected speech or gestures, you must find that the traffic stop was unreasonable.

As regards the second element, the parties have agreed that the defendant acted under color of law.

As regards the third element, the defendant's conduct caused the plaintiff's injuries if the plaintiff would not have been injured without the defendant's conduct, and the injuries were a reasonably foreseeable consequence of the defendant's conduct.

Jury Instruction No. 15, ECF No. 137. Neither party objected to the instruction. Ultimately, the jury returned a verdict in favor of Coleman, as set forth in the verdict form:

(1) Was defendant Rob Coleman's traffic stop of plaintiff Brian H. Clark unreasonable, i.e., did the defendant lack reasonable suspicion to stop the vehicle and detain the plaintiff?

    a. Yes_____ No __✓__

If you answered Yes to this question, go to Question 2. If you answered No, skip the remaining questions, go to the Signature Section at the end of the form, and have your foreperson sign it.

Verdict Form, ECF No. 138.

Thereafter, Clark filed a Motion Pursuant to Rule 50(b) and Rule 59 of the Federal Rules of Civil Procedure (i) to Set Aside the Judgment in Favor of Defendant; (ii) to Set Aside the Jury Verdict; (iii) to Enter a Directed Verdict for Plaintiff; and (iv) to Order a New Trial on Damages. ECF No. 141. Coleman opposed the motion, ECF No. 148, primarily focusing on the reasonableness of the traffic stop. Clark replied, responding to the argument that the vehicle was appropriately siezed. ECF No. 149. The court invited both parties to submit supplemental briefs on the issue of damages, which Coleman did. ECF No.154. The matter is ripe for disposition.

## II.

Under Federal Rule of Civil Procedure 50(a), after a party has been fully heard on an issue, if the court finds that a "reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may . . . grant a motion for judgment as a matter of law against the party on a claim . . . ." Fed. R. Civ. P. 50(a)(1)(B). "If the court does not grant a motion for judgment as a matter of law under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed. R. Civ. P. 50(b). A new trial may be granted after the conclusion of a jury trial. Fed. R. Civ. P. 59(a)(1)(A). "A court, however, may not disturb the verdict where there was sufficient evidence for a reasonable jury to find in the non-movant's favor." Dotson v. Pfizer, Inc., 558 F.3d 284, 292 (4th Cir. 2009) (citing Lack v. Wal-Mart Stores, Inc., 240 F.3d 255, 259 (4th Cir. 2001)). "A trial court may not appropriately enter [judgment as a matter of law] unless it concludes, after consideration of the record as a whole in the light most favorable to the non-movant, that the evidence presented supports only one reasonable verdict, in favor

of the moving party." <u>Williams v. Cerberonics, Inc.</u>, 871 F.2d 452, 458 (4th Cir. 1989) (citations omitted).

"The burden falls heavily upon a party seeking to set aside a jury verdict, for it is well established that the court must view the jury verdict in the light most favorable to the party in whose favor it is found, and such a party is entitled to the benefit of all inferences which the evidence fairly supports, even though contrary inferences might be drawn." <u>Hackett v. Stuckey's, Inc.</u>, 670 F. Supp. 172, 173 (W.D. Va. 1987) (citing <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979)). "Issues of fact are left to the determination of the jury, whose duty it is to determine the credibility of the witnesses, and the court should not substitute its judgment for that of the jury in disputed cases." <u>Id.</u> (citing <u>Jacobs v. The College of William & Mary</u>, 517 F. Supp. 791, 794 (E.D. Va. 1980)). "Only in those rare situations where the jury's verdict is wholly contrary to the law or the evidence, or without evidence to support it, is it proper for the court to grant judgment <u>non</u> <u>obstante</u> <u>verdicto</u>. The applicable standard permits the court to grant the judgment n.o.v. only when 'the evidence is such that without weighing the credibility of the witnesses there can be but one reasonable conclusion as to the verdict.'" <u>Id.</u> (quoting <u>Brady v. S. Ry. Co.</u>, 320 U.S. 476, 479–80 (1943)).

## III.

The issue here is a discrete one: may an officer, consistent with the First and Fourth Amendments, seize a vehicle and its passengers simply because a passenger in the vehicle displayed his middle finger at the officer? "In determining whether a Fourth Amendment violation occurred we draw all reasonable factual inferences in favor of the jury verdict, but as we made clear in <u>Ornelas v. United States</u>, 517 U.S. 690, 697–699 (1996), we do not defer to

the jury's legal conclusion that those facts violate the Constitution." Muehler v. Mena, 544 U.S. 93, 98 n.1 (2005). Neither the facts nor the law support Coleman's argument that the seizure was reasonable under the Fourth Amendment because he did not have "reasonable, articulable suspicion that criminal activity [was] afoot" to stop the vehicle. Illinois v. Wardlow, 528 U.S. 119, 123 (2000) (citing Terry v. Ohio, 392 U.S. 1, 30 (1968)). Further, the seizure is not justified under any Fourth Amendment exception.

### A.

The law is this area is well-settled. The Fourth Amendment "prohibits unreasonable searches and seizures by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." United States v. Arvizu, 534 U.S. 266, 273 (2002) (internal quotation marks omitted). "In the nearly fifty years that have passed since issuing its seminal decision in Terry v. Ohio, the Supreme Court has frequently revisited the issue of reasonableness in the context of traffic stops and made clear that an investigatory stop 'is permissible under the Fourth Amendment if supported by reasonable suspicion' that criminal activity may be afoot." United States v. Stacks, 571 F. App'x 163, 169 (4th Cir. 2014) (per curiam) (quoting Ornelas v. United States, 517 U.S. 690, 693 (1996)). Likewise, a traffic stop may be supported by probable cause that the driver had committed a civil traffic violation. Whren v. United States, 517 U.S. 806, 810 (1996).

At trial, the jury was instructed that a traffic stop was a seizure under the Fourth Amendment, and that a stop is "reasonable if the officer had reasonable suspicion to believe the plaintiff had committed or was committing a crime." Jury Instruction No. 15, ECF No. 137. Even taking the facts in the light most favorable to Coleman, see Szedlock v. Tenet, 139

F. Supp. 2d 725, 729 (E.D. Va. 2001), displaying one's middle finger is not illegal, nor does the gesture "on its own create probable cause or reasonable suspicion that [Clark] violated any law." Cruise-Gulyas v. Minard, 918 F.3d 494, 496 (6th Cir. 2019). "This ancient gesture of insult is not the basis for a reasonable suspicion of a traffic violation or impending criminal activity." Swartz v. Insogna, 704 F.3d 105, 110 (2nd Cir. 2013) (emphasis in original). Here, Coleman based the stop solely on Clark's display of an offensive gesture. On that basis, the stop was not grounded in reasonable suspicion of criminal activity.

In his briefing on the Rule 50 and 59 motions, Coleman argues he had reasonable suspicion that Clark was violating Va. Code Ann. § 18.2-388, which makes public intoxication a crime. Resp. to Rule 50 and 59 Mots., ECF No. 148, at 7-8. This post hoc rationalization, however, cannot be squared with the evidence presented at trial, and specifically Coleman's own testimony. By his own admission, it was his "concern" for Clark's safety that motivated the stop, not suspicion of criminal activity.

Of crucial significance to the court's view of this case is the fact that Coleman had just seen Clark minutes before in court where Clark displayed no "untoward" behavior and did not appear intoxicated. Tr. 203:25-204:1; 232:11-16. Under these circumstances, Coleman's expressed concern over safety cannot ring true.[4]

---

[4] Moreover, even if Coleman did think Clark was "drunk," the evidence still is insufficient to establish reasonable suspicion that Clark was violating Va. Code Ann. § 18.2-388. "A person is 'intoxicated' if he 'has drunk enough alcoholic beverages to observably affect his manner, disposition, speech, muscular movement, general appearance or behavior.'" United States v. Brown, 401 F.3d 588, 596–97 (4th Cir. 2005) (quoting Va. Code Ann. § 4.1-100). Here, Coleman testified that he observed Clark in court that morning, less than half an hour before he pulled over the car in which he was a passenger. At that time, he did not appear intoxicated to Coleman. Tr. 232:15–16. Thus, aside from his constitutionally protected speech, nothing suggested to Coleman that Clark was intoxicated, much less that Clark was "belligerent to the point where [he was] very intoxicated or could have a mental illness," as Coleman testified was his experience every time he had been "flipped off" before. Tr. 207:8–9. To countenance Coleman's argument would, in no uncertain terms, eviscerate the protections of the First Amendment, albeit for the offensive speech in question here.

In <u>Swartz v. Insogna</u>, the Second Circuit was faced with an officer who asserted the passenger's middle finger indicated to him that the passenger "'was trying to get [his] attention for some reason' and that [the officer] 'was concerned for the female driver.'" 704 F.3d at 110. In rejecting the reasonableness of the stop, the court stated:

> Perhaps there is a police officer somewhere who would interpret an automobile passenger's giving him the finger as a signal of distress, creating a suspicion that something occurring in the automobile warranted investigation. And perhaps that interpretation is what prompted Insogna to act, as he claims. But the nearly universal recognition that this gesture is an insult deprives such an interpretation of reasonableness. This ancient gesture of insult is not the basis for a <u>reasonable</u> suspicion of a traffic violation or impending criminal activity. Surely no passenger planning some wrongful conduct toward another occupant of an automobile would call attention to himself by giving the finger to a police officer. And if there might be an automobile passenger somewhere who will give the finger to a police officer as an ill-advised signal for help, it is far more consistent with all citizens' protection against improper police apprehension to leave that highly unlikely signal without a response than to lend judicial approval to the stopping of every vehicle from which a passenger makes that gesture.
>
> On the Plaintiff's version of the facts, the stop was not lawful . . . .

<u>Id.</u> The same is true here. Even if the jury accepted Coleman's proffered reason for the stop, the basis was not reasonable as a matter of law. And even if it had accepted the argument he raises now—that he believed Clark was intoxicated or mentally ill—that basis is not reasonable as a matter of law.

## B.

Even if an officer did not have reasonable suspicion that a crime was afoot, a traffic stop can be justified if one of the limited exceptions to the Fourth Amendment applies. At trial, Coleman's testimony implicated two potential exceptions to the Fourth Amendment: (1)

the community caretaking doctrine, and (2) exigent circumstances existed justifying the seizure. Specifically, Coleman argued that the impetus for his stop was a concern for Coleman's safety and the public welfare. Neither exception to the Fourth Amendment was expressly asserted by Coleman in briefs or at trial, nor was a jury instruction requested on either exception. Regardless, there is insufficient evidence for a jury to find either exception applies to the facts of this case.

The community caretaking exception to the warrant requirement can, under limited circumstances, justify a search or seizure when there is no reasonable basis to believe criminal activity is underway. Cady v. Dombrowski, 413 U.S. 433, 441 (1973). Community caretaking functions include established procedures or routine activities such as impoundment of a vehicle that impedes the safe flow of traffic, entry into a car after a traffic accident to assess occupants' medical conditions, or opening a truck compartment to identify the owner. See South Dakota v. Opperman, 428 U.S. 364, 368-69 (1976); United States v. Johnson, 410 F.3d 137, 145 (4th Cir. 2005); Durney v. Doss, 106 F. App'x 166, 169 (4th Cir. 2004). The Fourth Circuit has held that the community caretaking doctrine also extends to activities "protecting the safety of persons or property." United States v. Gillespie, 332 F. Supp. 2d 923, 929 (W.D. Va. 2004); see Phillips v. Peddle, 7 F. App'x 175, 178 (4th Cir.2001). However, there are two limits to this exception. First, the doctrine can only apply to police activities "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." United States v. Ramage, No. 1:09CR61, 2009 WL 10677237, at *6 (N.D. W. Va. July 13, 2009) (citing Cady, 413 U.S. at 441). Second, there cannot be anything on the record to suggest assertion of this exception is pretextual or in bad faith. United States v.

Gwinn, 219 F.3d 326, 335 (4th Cir. 2000) (finding that officer's reentry into suspect's home to obtain suspect's shoes and shirt was not a Fourth Amendment violation).

In addition to the community caretaking exception to the Fourth Amendment, the Supreme Court and this Circuit have held that more general "emergencies," which evince "a sufficient level of urgency, may also constitute an exigency and justify a warrantless entry and search." United States v. Yengel, 711 F.3d 392, 397 (4th Cir. 2013); see also, Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006); United States v. Hill, 649 F.3d 258, 265 (4th Cir. 2011). Under the exigency exception, the person conducting the seizure "must have had an objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within." United States v. Moss, 963 F.2d 673, 678 (4th Cir. 1992). "An objectively reasonable belief must be based on specific articulable facts and reasonable inferences that could have been drawn therefrom." Yengel, 711 F.3d at 397; see also Mora v. City of Gaithersburg, 519 F.3d 216, 224 (4th Cir. 2008) (citing Terry v. Ohio, 392 U.S. 1, 21 (1968)). When analyzing whether an exigency exists, courts should give some deference to the decisions of trained law enforcement officers to avoid "'unreasonable second guessing' of the officers' assessment of the circumstances that they faced." Figg v. Schroeder, 312 F.3d 625, 639 (4th Cir. 2002) (quoting United States v. Montoya de Hernandez, 473 U.S. 531, 542 (1985)). However, it is incumbent on courts to gauge the reasonableness of an officer's decision in light of the objective evidence. Id.

The emergency doctrine is similar to, but distinct from, the community caretaker doctrine. Both exceptions to the Fourth Amendment arise out of law enforcement's duty to protect persons and property. Moss, 963 F.2d at 678 (stating the emergency exception to

warrant requirement permits officers to make searches in order "to protect property or persons from immediately threatened harm, or to render assistance to persons in need"); Gillespie, 332 F.Supp.2d at 929 (stating that the community caretaker exception to the warrant requirement "allows officers who are ... protecting the safety of persons or property, to make warrantless searches."). "The community caretaking doctrine requires a court to look at the function performed by a police officer, while the emergency exception requires an analysis of the circumstances to determine whether an emergency requiring immediate action existed. Thus, as the district court noted, the doctrines have different 'intellectual underpinning[s].'" Hunsberger v. Wood, 570 F.3d 546, 554 (4th Cir. 2009) (quoting Hunsberger v. Wood, 564 F.Supp.2d 559, 567 (W.D. Va. 2008)).

The Fourth Circuit has indicated that the community caretaking doctrine is more applicable when officers are engaged in "a routine police procedure, such as the policy of locating weapons in towed cars" and that "the court should examine the programmatic purpose of the policy—whether it was animated by community caretaking considerations or by law enforcement concerns." Hunsberger, 570 F.3d at 554. Under a community caretaking doctrine, the court may also inquire as to the subjective motivations of the officer, in determining whether his public safety concerns were mere pretext. Gillespie, 332 F. Supp. 2d at 929. Alternatively, when an officer is "responding to an emergency, and not as part of a standardized procedure, the exigent circumstances analysis and its accompanying objective standard should apply." Hunsberger, 570 F.3d at 554. Additionally, the Fourth Circuit has emphasized that this "emergency exigency" exception to the warrant requirement justifies "immediate entry as an incident to the service and protective functions of the police as

opposed to, or as a complement to, their law enforcement functions." <u>United States v.</u> <u>Ramage</u>, No. 1:09CR61, 2009 WL 10677237, at *6 (N.D. W.Va. July 13, 2009) (quoting <u>Moss</u>, 963 F.2d at 678). Therefore, where community caretaking activities must be wholly untainted by investigatory motivations, the emergency aid exception can apply to activities more closely tied to law enforcement functions.

The community caretaker doctrine does not apply to the facts of this case. First, Coleman's traffic stop is not "totally divorced" from investigative functions, based on his own representations. A court in this district chose not to apply the community caretaking exception because the warrantless home entry at issue felt closely related to a potential investigation, even though officers testified a search was not conducted until a warrant was obtained. <u>United</u> <u>States v. Davis</u>, No. 4:07CR00014, 2007 WL 2301583, at *4 (W.D. Va. Aug. 9, 2007) ("Nonetheless, I am reluctant to ground this decision solely on the community caretaker exception because looking for a shooting suspect or his potential victims is a situation in which law enforcement's community caretaker functions coincide with their investigative functions."). Similarly, Coleman argued that there existed reasonable suspicion to believe Clark was violating Virginia's public intoxication statute, which forecloses reliance on the community caretaker doctrine to justify his actions. <u>See</u> <u>Johnson</u>, 410 F.3d at 145 ("The exception applies only to conduct that is 'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute,' and not when community-caretaking functions are used as 'a subterfuge from criminal investigations.'") (quoting <u>Dombrowski</u>, 413 U.S. at 441). Because Coleman contends he was investigating a potential violation of Va. Code Ann. § 18.2-388, the community caretaking exception cannot

justify his actions. See id. at 143–44 ("Indeed, the exception only applies when the police are not engaged in a criminal investigation . . . .").

Second, Officer Coleman's alleged public safety concern seems questionable, at best. Brigham City, 547 U.S. at 403 ("We begin with the familiar proposition that reasonableness is "the ultimate touchstone of the Fourth Amendment. . ."). Although the Fourth Circuit has not established a standard to evaluate the officer's purported public safety concern, a district court in this circuit applied a "reasonable articulable suspicion" standard to assess the officer's claimed concern. United States v. Tavarez-Rojas, No. 1:07CR126, 2008 WL 622041, at *4 (W.D. N.C. Mar. 4, 2008) ("A Terry stop may also be appropriate where the officer has a reasonable articulable belief that a motorist, while not engaged in unlawful driving, poses a threat to public safety or himself, or appears to be in need of assistance."). In that case, the officer was found to have "clearly articulated reasonable concerns. . . for the safety of the motoring public, to wit, that an accident could be caused if the van's rear bumper fell off or if cargo fell out of what she perceived to be an unlatched and partially open rear cargo hatch." Id. at *5. In another case, the court found officers stated "credibly and reasonably that when they saw defendant and Eason unconscious in the Malibu they were concerned that the two might be having a medical emergency." United States v. Thompson, No. 7:17-CR-164-FL-1, 2018 WL 6174690, at *9 (E.D. N.C. July 11, 2018), report and recommendation adopted, No. 7:17-CR-164-FL-1, 2018 WL 4896721 (E.D. N.C. Oct. 9, 2018). Here, Coleman claims he was concerned Clark was drunk or mentally ill, because he could not fathom why else an individual would flip off a uniformed officer. Critically, however, Coleman had just seen Clark in court, saw no signs of visible intoxication or any other untoward behavior, and knew Clark was not

operating the vehicle he pulled over. Tr. 203:25-204:1; 232:11-16. Coleman's recent observation of Clark in the courtroom calls into question both his suspicion that Clark was a danger to himself, as he had just presented himself in court one half-hour earlier without issue, and his concern for the public, as Clark was not operating the vehicle.

Third, there is evidence in the record that suggests Coleman's assertion of concern for Clark's safety and that of the public was pretextual. Johnson, 410 F.3d 137, 145 (4th Cir. 2005) ("If Officer Bentivegna's stated reasons for the search were pretextual, the community-caretaking exception would not apply."). The fact that Coleman did not permit Clark to leave after confirming he was okay casts doubt on his intentions. See United States v. Taylor, No. 3:09CR249, 2009 WL 3334654, at *7 (E.D. Va. Oct. 14, 2009), aff'd, 624 F.3d 626 (4th Cir. 2010) (applying the community caretaker doctrine to a warrantless entry when an officer terminated the interaction as soon as his concern for a lost child abated). While, "[t]he maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision," the detention should not last "longer than was necessary, given its purpose." United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008); See Florida v. Royer, 460 U.S. 491, 500 (1983) (plurality opinion). "Thus, once the driver has demonstrated that he is entitled to operate his vehicle, and the police officer has issued the requisite warning or ticket, the driver 'must be allowed to proceed on his way.'" Id. (quoting United States v. Rusher, 966 F.2d 868, 876 (4th Cir.1992)). In Gillespie, the court found a community caretaking claim insufficient, in part because the officers "called for backup, requested a K–9 unit to assist him, and started to interview neighbors," which made their community caretaking claim seem pretextual. Gillespie, 332 F. Supp. 2d at 930. Similarly, Coleman never approached the driver of the

vehicle, and after making sure Clark was okay, he did not permit the car to leave, but rather returned to his vehicle and called dispatch to run a check on Clark. During that time, several other police vehicles arrived. Unlike in <u>Thompson</u>, also a vehicular search and seizure, Coleman did not develop probable cause to prolong the interaction upon seizing the car. <u>Thompson</u>, 2018 WL 6174690 at *9. Whatever reasons Coleman had for prolonging the stop, they seem unrelated to his concern for Clark's or the public's wellbeing.

The facts of this case also fall short of justifying the emergency aid doctrine. The Fourth Circuit has not yet held whether this doctrine can apply to searches and seizures of a vehicle, but the Fifth Circuit has. <u>See</u> <u>United States v. Toussaint</u>, 838 F.3d 503, 507–08 (5th Cir. 2016) ("No federal court of appeals has yet approved (nor has any rejected) the extension of this doctrine to a vehicular stop. But there is no logical difficulty with extending the exception to those particular situations."). Assuming it is applicable, the circumstances at hand still fall short of those required by the emergency aid doctrine. First, Coleman did not possess an objectively reasonable belief that an emergency existed requiring immediate aid. Coleman's only basis for concern was that Clark had made an insulting gesture at an officer. There was no evidence of injury or any kind of weapon. <u>United States v. Ramage</u>, No. 1:09CR61, 2009 WL 10677237, at *8 (N.D. W.Va. July 13, 2009). There was no evidence of violence likely to continue. <u>Brigham City</u>, 547 U.S. at 403. Even if there were sufficient evidence of an emergency, there was no evidence of a situation requiring immediate aid. <u>See</u> <u>Yengel</u>, 711 F.3d at 397-400 (refusing to apply the emergency aid doctrine when officers are informed there is a grenade in the house, because there was insufficient evidence that the grenade was an immediate threat); <u>Gillespie</u>, 332 F. Supp. 2d at 927–28 (refusing to apply the emergency aid doctrine when

officers claimed they were concerned about crying children inside an apartment after they saw two individuals escape from the balcony of that apartment: "Although the officers may have believed that there were children in the apartment and been genuinely concerned about them, their belief that this situation rose to the level of an *emergency which required immediate entry* is not objectively reasonable.")(emphasis in original). Plainly, the attenuated suspicion of unwellness arising out of an offensive gesture does not pass constitutional muster. Moreover, even if the emergency aid doctrine did apply, it could not justify the extended nature of the stop. United States v. Moss, 963 F.2d 673, 678 (4th Cir.1992) ("[W]arrantless entry for emergency reasons ... cannot be used as the occasion for a general voyage of discovery unrelated to the purpose of the entry.").

Taking the evidence in total and giving Coleman and the jury's verdict every supportable inference, there is simply no basis in the law to justify the seizure of Clark on July 25, 2016. The evidence establishes Coleman effectuated a seizure of Clark without reasonable suspicion of wrongdoing, and that his actions, under color of law, amount to a constitutional violation. Because the evidence does not reveal any reasonable basis for the seizure of Clark following his constitutionally protected speech, however crude, inappropriate, and unwarranted it may have been, the jury's verdict is contrary to law and must be set aside, and the court will direct judgment be entered for Clark.

**IV.**

Because Clark seeks money damages, he must overcome Coleman's qualified immunity. Hunsberger v. Wood, 570 F.3d 546, 552 (4th Cir. 2009). "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages

insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). "Qualified immunity protects law enforcement officers from 'bad guesses in gray areas' and ensures that they are liable only 'for transgressing brightlines.'" <u>Phillips v. Peddle</u>, 7 F. App'x 175, 178 (4th Cir. 2001) (quoting <u>Maciariello v. Sumner</u>, 973 F.2d 295, 298 (4th Cir. 1992).) To evaluate qualified immunity claims, the Fourth Circuit has adopted a two-step analysis: (1) Whether a clearly established right has been violated, and (2) whether a reasonable person in the officer's position "would have known that the officer's conduct would violate that right." <u>Id.</u> As the court holds that pulling over a vehicle without reasonable suspicion of criminal activity or a valid claim of under any established Fourth Amendment exception violates a clearly established right, it must proceed to the second step of the analysis.

The crux of the second prong of this analysis is whether a reasonable officer would have known he cannot pull over a vehicle based on nothing more than the passenger making an insulting gesture at him. The inquiry hinges on "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," which requires the court to establish the contours of established law at the time. <u>Saucier v. Katz</u>, 533 U.S. 194, 202 (2001)); <u>Smith v. Ray</u>, 855 F. Supp. 2d 569, 578 (E.D. Va. 2012), <u>aff'd</u>, 781 F.3d 95 (4th Cir. 2015) ("This pure question of law turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'") (quoting <u>Wilson v. Layne</u>, 526 U.S. 603, 614 (1999)). The established law must then be applied to the specific facts of the case, to assess the reasonableness of the officer's actions. While the test is an objective one, "the immunity inquiry must be filtered through the lens of the officer's

perceptions at the time of the incident in question." Rowland v. Perry, 41 F.3d 167, 173 (4th Cir. 1994).

Although the Fourth Circuit has yet to rule on these specific facts, the court's review of the established law is not so limited. "In determining whether a right is clearly established, it is not necessary for a court to have previously considered the exact facts at issue, or that there be a case involving 'fundamentally similar' facts, so long as 'in light of the pre-existing law the unlawfulness [is] apparent.'" Garcia v. Montgomery Cty., Maryland, 145 F. Supp. 3d 492, 505–06 (D. Md. 2015) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002); see also Buckley v. Rogerson, 133 F.3d 1125, 1129 (8th Cir. 1998) ("In order to determine whether a right is clearly established, it is not necessary that the Supreme Court has directly addressed the issue, nor does the precise action or omission in question need to have been held unlawful. In the absence of binding precedent, a court should look to all available decisional law, including decisions of state courts, other circuits, and district courts.") (citations omitted). Indeed, "officials can still be on notice that their conduct violates established law even in novel factual circumstances," as long as they had "fair warning" that their conduct was unconstitutional. Pelzer, 536 U.S. at 740–41.

At summary judgment, the court held that Coleman's claim of qualified immunity did not withstand scrutiny and would be denied. It found that "even if Plaintiff did "gig"[5] Coleman, [] the law clearly establishes that a traffic stop under those circumstances would not comport with the First or Fourth Amendments." Clark v. Coleman, 335 F. Supp. 3d 818, 828 (W.D. Va. 2018). Although Coleman renewed his qualified immunity claim at trial, the court

---

[5] The court understands this term to mean showing the middle finger.

finds no new basis on which to find qualified immunity applies to the unlawful seizure. The court thoroughly evaluated the argument that qualified immunity should apply to Coleman's assertion that Clark's insulting gesture gave rise to reasonable articulable suspicion of a crime. Id. Following trial, the court must address whether Coleman's public safety concern, though insufficient to give rise to a valid community caretaking or emergency aid claim, is protected by qualified immunity. In other words, does Clark have a clearly established right against seizure by an officer who is concerned about his own welfare and the welfare of others simply because he made an offensive gesture? The court finds that he does.

It is axiomatic that officers are on abundant notice of stringent free speech protections. Gestures intended to communicate ideas are protected speech under the First Amendment of the Constitution, subject to strict limitations. Terminiello v. City of Chicago, 337 U.S. 1, 4 (1949) ("Speech is often provocative and challenging . . .[But it] is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest."). "Fighting words" are not protected. City of Houston v. Hill, 482 U.S. 451 (1987). The Supreme Court has held on numerous occasions that the "First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." Hill, 482 U.S. at 461. It has said that "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." Id. at 463. In his concurring opinion, Justice Powell suggested that "even the 'fighting words' exception recognized in Chaplinsky . . . might require a narrower application in cases involving words addressed to a police officer, because 'a properly

trained officer may reasonably be expected to exercise a higher degree of restraint' than the average citizen, and thus be less likely to respond belligerently to 'fighting words.'" Id. at 462 (quoting Lewis v. City of New Orleans, 415 U.S. 130, 135(1974); Chaplinsky v. New Hampshire, 315 U.S. 568 (1942)). Officers must surmount a high constitutional bar to interpret expression as giving rise to police action, even under their protect and serve duties.

Coleman cannot make a colorable claim that presenting the middle finger gives rise to a reasonable concern for public safety. Courts across the country have refused to find that offensive language or gestures rise to the level of fighting words that would cause a reasonable officer concern about public safety. Clark, 335 F. Supp. 3d at 828. In fact, many have refused to apply qualified immunity to parallel fact patterns. See, e.g., Nichols v. Chacon, 110 F. Supp. 2d 1099, 1103 (W.D. Ark. 2000), aff'd, 19 F. App'x 471 (8th Cir. 2001) ("This is far from the first case in which a private citizen has either by words or gesture communicated an offensive message to a law enforcement officer. Nor is much of this body of law of recent vintage."); Minard, 918 F.3d at 497 (stating "no matter how he slices it, Cruise-Gulyas's crude gesture could not provide that new justification," for plaintiff's seizure under any Fourth Amendment theory); Stearns v. Clarkson, 615 F.3d 1278, 1283 (10th Cir. 2010) (denying qualified immunity when an officer makes an arrest on an individual who was "loud, belligerent, smelled of alcohol, and pointed his finger at Officer Venable while using profanity"); Duran v. City of Douglas, Ariz., 904 F.2d 1372, 1378 (9th Cir. 1990) ("No less well established is the principle that government officials in general, and police officers in particular, may not exercise their authority for personal motives, particularly in response to real or perceived slights to their dignity. Surely anyone who takes an oath of office knows—or should know—that much.");

Patel v. Dennett, 389 F. Supp. 3d 888, 896 (D. Nev. 2018) ("And because it is clearly established that a citizen has the First Amendment right to criticize officers, even with profanity, Dennett is not entitled to qualified immunity on this claim."). Indeed, similar to the instant case, the Sixth Circuit in Sandul v. Larion, the court denied qualified immunity when an officer detained an individual who "leaned out of the vehicle as it passed by the abortion protesters and shouted 'f—k you,' and extended his middle finger to the group" in part because the individual was the passenger, not the driver, and the car was far from the target of the offensive behavior. 119 F.3d 1250, 1252 (6th Cir. 1997).

Moreover, Coleman's claim for qualified immunity cannot rest on his concern for Clark's and the public's wellbeing. Critically, Coleman had just seen Clark in court minutes before where Clark appeared neither intoxicated nor dangerous. Moreover, as the vehicle's passenger, nothing about Clark's insulting display, however repugnant, objectively suggests any risk to public safety. Given the particular circumstances of this case, in which Coleman had just observed Clark's behavior in the courtroom minutes before the rude gesture, no reasonable officer could have maintained an objectively reasonable concern for public safety warranting a seizure under the Fourth Amendment.

## V.

Although the verdict cannot stand, the court declines Clark's motion for a partial new trial on the issue of damages. "The granting of a new trial is a matter resting in the sound discretion of the trial judge, and his action is not reviewable upon appeal except in the most exceptional circumstances." Wadsworth v. Clindon, 846 F.2d 265, 266 (4th Cir. 1988).

The court sees no reason to empanel a new jury on the issue of damages, because Clark did not demonstrate at trial the existence of any compensable injury. The court has wide discretion to decline a request for a partial new trial. Fabri v. The Hartford, 69 F. App'x 187, 192 (4th Cir. 2003) (stating that decisions to deny a new trial on the issue of damages are reviewed for abuse of discretion). Clark indicates here that the jury did not reach the question of damages in the instant case, because they resolved the matter for the defendant on the reasonableness of the stop. Mem. in Supp. of Rule 50 and 59 Mots., ECF No. 142, at 6-7. However, as Coleman contends, "[a] Rule 59(e) motion is neither a second bite at the apple nor an opportunity for a litigant to raise issues it could have raised in the first instance prior to entry of judgment." Supp. Mem. in Opp'n to Rule 50 and 59 Mots., ECF No. 154, at 2 (citing OpenRisk, LLC v. MicroStrategy Servs. Corp., 876 F.3d 518, 529 (4th Cir. 2017)). Clark has indicated no newly discovered evidence and so the court evaluates the request for a partial new trial based on the record. The Supreme Court directs that "determination of whether a new trial should be granted or a judgment entered under Rule 50(b) calls for the judgment in the first instance of the judge who saw and heard the witnesses and has the feel of the case." Globe Liquor Co. v. San Roman 332 U.S. 571, 572 (1948). As the court has heard from all witnesses and reviewed all evidence, it is fit to make a determination as to the existence of compensable damages. In denying Clark's motion for new trial on the issue of damages, the court finds as a matter of law that Clark did not prove injury.

Based on the evidence submit at trial, the court finds that Clark has not presented any evidence from which a jury could find the existence of compensable damages. From the outset, Clark did not plead with any specificity an amount of compensable damages sought. At trial,

Clark conceded the briefness of the detention and minimality of the inconvenience. Tr. 12:12-24. Clark claims he felt threatened but does not present any evidence of emotional distress. Tr. 88:19-21. "A plaintiff seeking compensatory damages for emotional injuries cannot rely on 'conclusory statements that the plaintiff suffered emotional distress [or] the mere fact that a constitutional violation occurred,' but, rather, 'the testimony must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated.'" Knussman v. Maryland, 272 F.3d 625, 640 (4th Cir. 2001) (quoting Price v. City of Charlotte, 93 F.3d 1241, 1254 (4th Cir. 1996)). Although Clark claims he lost government contracts because his security clearance was delayed, he presented no link between the traffic stop and any delay in his security clearance beyond the wild speculation. Indeed, Clark conceded that there was no public record of his encounter with Coleman beyond this lawsuit. Tr. 106:4-19; 107:8-25; 108:1-8; 112:6-18. As the Fourth Circuit has held, injury "experienced as a by-product of litigation or the grievance process was not caused by 'the constitutional deprivation itself'" and is therefore not compensable. Id. at 641 (quoting Price, 93 F.3d at 1250).

In the absence of a compensable injury, the court is free to award nominal damages. See Carey v. Phiphus, 425 U.S. 247, 248 (1978); Farrar v. Hobby 506 U.S. 103, 121 (1992) ("Carey obligates a court to award nominal damages when a plaintiff establishes the violation of [a constitutional right] but cannot prove actual injury"). Under common law, courts can vindicate absolute rights through the award of a nominal sum of money, even without proof of actual injury. Carey, 425 U.S. at 266. In doing so, "the law recognizes the importance to organized society that those rights be scrupulously observed." Id. The right against unreasonable stops is such a right in that its existence "does not depend upon the merits of a

claimant's substantive assertions." <u>Id.</u> However, the brevity of the detention and the lack of demonstrable injury warrants no more than nominal damages. <u>See, e.g.,</u> <u>Norwood v. Bain</u>, 166 F.3d 243, 245 (4th Cir. 1999) (en banc) (concluding that plaintiffs who were unconstitutionally searched and seized for a brief period of time were only entitled to nominal damages).

Punitive damages are not an issue in this case. Punitive damages under 42 U.S.C. § 1983 are appropriate "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." <u>Smith v. Wade</u>, 461 U.S. 30, 56 (1983). Here, no evidence was submitted to the jury on which it could conclude that Coleman's conduct was motivated by evil intent. To the contrary, the only evidence on this point was that Coleman had no ill will towards Clark. Insofar as there was testimony that Coleman was angry, even assuming the jury credited that testimony, that anger was directed at Freeman, not Clark. Furthermore, assuming there was a plan to "take down" Clark, there is no evidence whatsoever that Coleman was aware of any such plan, much less a participant in conversations regarding any such a plan or a willing participant in any such conspiracy.

Likewise, the evidence does not establish that Coleman's actions amounted to "reckless or callous indifference" to Clark's federally protected rights. <u>Id.</u> The only evidence regarding Coleman's motives for his actions was his professed concern for Clark's wellbeing, and the evidence of a conspiracy to "take down" Clark simply does not implicate Coleman.[6] Absent any competent evidence that Coleman's actions were motivated by anything other than a

---

[6] The jury apparently credited Coleman's testimony that, during his entire career, he has never known of anyone to "flip off" a uniformed police officer unless the person was intoxicated or mentally ill. Because the court is required to give all reasonable inferences to Coleman, the court is bound to accept that rationale.

misunderstanding of the limits of his constitutional authority, there is simply no basis to submit the question of punitive damages to a jury.

The court may grant Clark attorney's fees. To qualify for attorney's fees, a party must meet the definition of "prevailing party" under the civil rights attorney's fees provision. 42 U.S.C.A. §1988. To be a "prevailing party," a plaintiff must obtain an enforceable judgment against defendant from whom fees are sought, which in this case, would be the judgment to award Clark nominal damages. Farrar v. Hobby, 506 U.S. at 112-13. "A judgment for damages in any amount, whether compensatory or nominal, modifies the defendant's behavior for the plaintiff's benefit by forcing the defendant to pay an amount of money he otherwise would not pay." Id. In some instances, the court may not award the prevailing party attorney's fees if so granting would result in a windfall to said attorneys. Riverside v. Rivera, 466 U.S. 561, 580 (1986). "When a plaintiff recovers only nominal damages because of his failure to prove an essential element of his claim for monetary relief, the only reasonable fee is usually no fee at all. Farrar, 506 U.S. at 115 (internal citations omitted).

However, the Fourth Circuit has held "[b]ecause the Court in Farrar held that plaintiffs recovering only nominal damages usually or often will not be entitled to an award of attorney's fees, it is clear that such plaintiffs will at least sometimes be entitled to a fee award." Mercer v. Duke Univ., 401 F.3d 199, 203 (4th Cir. 2005); see also Clark v. Sims, 28 F.3d 420, 424–25 (4th Cir. 1994) (remanding for district court to consider attorney's fee request by plaintiff who was awarded only nominal damages). In discerning nominal damage cases that do not warrant attorney's fees from the ones that do, the Fourth Circuit looks at factors identified by Justice O'Connor in Farrar, including "'the extent of relief, the significance of the legal issue on which

the plaintiff prevailed, and the public purpose served' by the litigation." <u>Mercer</u>, 401 F.3d at 204 (remanding for district court to consider attorney's fee request by plaintiff who was awarded only nominal damages).

Upon balancing the factors, the court finds plaintiff is eligible for attorney's fees. The first factor instructs the court to compare the amount of compensable damages sought to the amount awarded. <u>Id.</u> at 206. While an award of nominal damages may appear limited relief, Clark never specified the damages he sought, primarily seeking a liability finding, condemnation of the officer's behavior, and punitive damages. Tr. 12:12-24 (conceding that compensable damages were limited but that a right was violated, requesting punitive damages). The second factor "is concerned with the general legal importance of the issue on which the plaintiff prevailed." <u>Mercer</u>, 401 F.3d at 206 (holding that discrimination against woman is an important legal issue). <u>See, e.g.</u>, <u>Maul v. Constan</u>, 23 F.3d 143, 145 (7th Cir. 1994) ("[W]e understand the second <u>Farrar</u> factor to address the legal import of the constitutional claim on which plaintiff prevailed."); <u>Piper v. Oliver</u>, 69 F.3d 875, 877 (8th Cir. 1995) (explaining that the plaintiff's "right to be free from illegal detention was a significant one"). An unreasonable stop based on an insluting gesture implicates not one, but two constitutional violations, and so this case is plainly of legal significance. The third factor evaluates the public purpose served by the litigation, "as opposed to simply vindicating the plaintiff's individual rights." <u>Mercer</u>, 401 F.3d at 207. In <u>Mercer</u>, although the court found that the plaintiff "ultimately obtained only limited success in her claim against Duke," the precedential value of the case could extend beyond the suit at hand. <u>Id.</u> at 208-09. Similarly, courts in this circuit have not had the opportunity to determine the outer bounds of how the Fourth Amendment's requirements of

reasonable suspicions interacts with First Amendment freedoms. That this court has had an opportunity to resolve the matter helps guide both officer behavior and future judicial determinations. <u>See, e.g.</u> <u>Project Vote/Voting for Am., Inc. v. Dickerson</u>, 444 F. App'x 660, 664 (4th Cir. 2011) ("Here, Plaintiffs successfully brought a meritorious civil rights claim to prevent the enforcement of an unconstitutional government regulation in the public interest; this is the very form of litigation Congress wished to encourage by enacting § 1988."); <u>Daly v. Hill,</u> 790 F.2d 1071, 1084 (4th Cir.1986) ( "[Section] 1988 is intended to encourage [civil rights plaintiffs] to bring suit by shifting the costs of litigation to defendants who have been found to be wrongdoers.").

### VI.

The jury's verdict lacks a "legally sufficient evidentiary basis . . . ." Fed. R. Civ. P. 50(a). Pursuant to Fed. R. Civ. P. 50(b), judgment will be entered for Clark. Pursuant to Rule 50(c)(1), the court **GRANTS** Clark's motion to set aside the jury verdict and enter a judgment in his favor. The court **DENIES** Clark's motion for a new trial on the issue of damages, instead awarding Clark nominal damages of $1 and attorney's fees.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to all counsel of record.

ENTERED: March 23, 2020

Michael F. Urbanski

Digitally signed by Michael F. Urbanski
DN: cn=Michael F. Urbanski, o=Western
District of Virginia, ou=United States District
Court, email=mikeu@vawd.uscourts.gov, c=US
Date: 2020.03.23 15:40:03 -04'00'

Hon. Michael F. Urbanski
Chief United States District Judge